# NO. 12-20-00250-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| **JUSTIN LEE FOUNTAIN,** **APPELLANT** | § | **APPEAL FROM THE 2ND** |
| **V.** | § | **JUDICIAL DISTRICT COURT** |
| **THE STATE OF TEXAS,** **APPELLEE** | § | **CHEROKEE COUNTY, TEXAS** |

## *MEMORANDUM OPINION*

The trial court convicted Appellant Justin Lee Fountain of two counts of injury to a child, assessed punishment at fifty years of confinement on each count, and ordered that the sentences would run concurrently.[1]  In four issues, Appellant challenges the denial of his motion to suppress, the admission of evidence regarding his confession, and the sufficiency of the evidence supporting his conviction as to both counts.  We affirm the trial court's judgments.

## BACKGROUND

Appellant was indicted for two counts of injury to a child.  As to both counts, the indictment alleged that Appellant intentionally or knowingly seriously injured A.F. by shaking her, throwing her, or causing her bassinette to fall over.  Count one alleged that Appellant committed an offense on or about June 26, 2018, through August 14, 2018, and count two alleged that Appellant committed an offense on or about August 15, 2018, through August 16, 2018.

In a pretrial motion to suppress his confession, Appellant asserted that he was unable to waive his *Miranda*[2] rights intelligently, knowingly, and voluntarily because he suffers from an intellectual developmental disability ("IDD").  Appellant included as an exhibit to his motion a

---

[1] Appellant waived his right to a jury trial as to both guilt-innocence and punishment.

[2] *See* **Miranda v. Arizona**, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

report from Dr. Patricia Plasay, a licensed forensic psychologist with Forensic and Clinical Psychology Center in Tyler. In her report, Plasay concluded that Appellant meets the criteria for a diagnosis of IDD, and she determined that Appellant "evidence[s] significant deficits in both intellectual and adaptive functioning" and has "a difficult time understanding complex, multi-step instructions."

At the hearing on the motion to suppress, Special Agent Rusty Hughes with the Texas Department of Safety Criminal Investigation Division testified that on June 24, 2019, he conducted a custodial interview of Appellant after the Rusk Police Department asked him to assist with the investigation. Before interviewing Appellant, Hughes read Appellant his *Miranda* rights. Hughes testified that he never coerced or threatened Appellant and did not deny Appellant any necessities. Hughes explained that he conducted a polygraph examination of Appellant, which consisted of four parts: the pre-test interview, data collection, data analysis, and post-test interview. According to Hughes, Appellant responded appropriately to questions and was able to follow a timeline. Hughes testified that Appellant initially acted as though he did not know how A.F. was injured, and he blamed others.

After administering the polygraph examination to Appellant and scoring it, Hughes believed Appellant was being deceptive regarding the questions about A.F., and he informed Appellant of the results of the examination. Hughes explained that during the interview he conducted after the polygraph examination, Appellant "originally started right back where he was, denying it, and it took a little while for him to finally decide to talk about what had happened between him and [A.F.]." Appellant eventually told Hughes that he had thrown A.F. onto the bed and apologized to her afterward. As the interview progressed, Appellant admitted that he shook A.F. and spun A.F.'s bassinette because he lost his temper. According to Hughes, Appellant did not show any signs of an intellectual disability during the interview. Hughes testified that Appellant comprehended what Hughes was saying, and "his responses were quick."

Dr. Plasay testified that defense counsel asked her to evaluate whether Appellant has an intellectual disability. In performing her evaluation, Plasay reviewed Appellant's court records, medical and psychiatric records, lease, school records, three interrogations of Appellant, and collateral information provided by defense counsel, and her report was admitted into evidence. Plasay also interviewed Appellant's parents, and she interviewed Appellant for three hours. Plasay concluded that Appellant has IDD, which she explained is "defined as significant deficits in

2

intellectual and adaptive functioning that are present during the formative years of development, meaning prior to age 18." Plasay stated that individuals who suffer from IDD have a lower IQ than 98% of the population. Plasay testified that Appellant "has a well-established, extensive psychiatric history dating back to his early childhood[,]" and Appellant "had marked behavioral and academic problems" in school and at home. According to Plasay, Access MHMR diagnosed Appellant with attention deficit hyperactivity disorder, learning disorder, generalized anxiety disorder, major depressive disorder, and borderline intellectual functioning.

Dr. Plasay explained that Appellant's IDD is mild, which means that Appellant has sufficient speech, can hold a reciprocal conversation, and can learn, but he needs modifications. According to Plasay, Appellant's estimated mental age is twelve years old, and his IQ is 70. Plasay testified that individuals who suffer from IDD are highly suggestible, and "[t]hey can be unduly influenced and defer to authority in some situations." Plasay explained that individuals with IDD "have an elevated risk of internalizing the suggestions of the interrogator." Plasay stated that she did not evaluate Appellant's comprehension of the *Miranda* warnings. When asked whether Appellant's level of verbal impairment would significantly impact his ability to understand a *Miranda* warning, Plasay stated that it is the trial judge's role to make that determination, and she explained, "All I can say is that based on the findings, he would struggle more than the average person." Plasay described Appellant's ability to understand and comprehend verbal information as "significantly impaired[,]" and she characterized his understanding during the interview by Special Agent Hughes as "[l]imited." Plasay opined that Appellant was confused and overwhelmed during the interview, and she testified that Appellant appeared to struggle with directions and did not fully understand everything that was asked of him. According to Plasay, people with IDD are more prone to giving false confessions, and she opined that Appellant falls into that category.

During cross-examination, Plasay testified that she did not ask Appellant whether he understood the *Miranda* warning, and she did not assess his ability to understand it. Plasay stated, "I can't render an opinion on an evaluation I didn't conduct." Plasay explained that a diagnosis of IDD does not preclude someone from understanding a *Miranda* warning. Plasay agreed that the only time Appellant appeared to be emotionally overwhelmed was when he was confessing to throwing A.F. onto the bed and shaking her. In addition, Plasay testified that she obtained all the information for her evaluation from defense counsel, and she admitted that if more records exist,

her opinion might change. Plasay explained that two previous assessments conducted during Appellant's school years concluded that Appellant does not suffer from IDD, but when Appellant was in school, he had "significant problems that required special education." Plasay explained that she was not testifying that Appellant's confession was false or coerced, and when asked whether his confession could have been voluntary and based upon a knowing and intelligent waiver of his rights, she stated that it "could have been." The trial court denied the motion to suppress.

At trial, Dr. Elizabeth Peeler testified that she is a physician in the REACH clinic of UT Southwestern and Children's Medical Center in Dallas, where she evaluates patients in cases of suspected child abuse or neglect. Peeler explained that A.F. suffered from abusive head trauma, formerly referred to as "shaken baby syndrome," when she was seven weeks old. According to Peeler, A.F. was a normal, healthy baby until August 15, 2018, when she was found unresponsive and not breathing. Upon examining A.F., Peeler discovered that the fontanelle at the top of A.F.'s head was full and bulging, which Peeler explained is a sign of increased pressure in the brain. Dr. Peeler testified that a CT scan revealed that A.F. had bilateral subdural hematomas, which "had a different appearance [than] the blood that appeared newer on CT scan, which was located in both of the temples on the back of the brain." Peeler testified that because A.F. did not have a skull fracture, her "acceleration-deceleration whiplash" injuries must have resulted from "a shaking-type mechanism[,]" such as shaking back and forth, shaking and slamming, or shaking and tossing.

According to Peeler, a chest X-ray revealed that A.F. also had a left first rib fracture, which was already in the healing stages. Peeler explained that because it takes seven to ten days for bone healing to be identifiable on x-rays, A.F.'s rib fracture must have occurred at least seven days earlier. Peeler testified that A.F. also suffered from five retinal hemorrhages in her left eye, which were caused by the same type of acceleration-deceleration whiplash mechanism. According to Peeler, none of A.F.'s family members provided any history of dropping her, and a brain bleed from a fall "would not be diffuse and bilateral" and would not cause such significant symptoms. Peeler explained that A.F. could have received her acceleration-deceleration injuries from being thrown onto the top of a bed because such an event "causes the brain to whiplash back and forth on the inside."

Peeler testified that A.F. required two neurosurgical procedures: (1) inserting a needle into her fontanelle to relieve the pressure, and (2) drilling a burr hole into her skull after the needle procedure did not fully relieve the pressure. A.F. also required a blood transfusion. According to

Peeler, an MRI scan indicated that the left frontal part of A.F.'s brain had begun to atrophy due to "[a] significant trauma" that resulted in a lack of nutrients to the brain. Peeler explained that A.F.'s injuries created a substantial risk of death, and A.F. required cardiopulmonary resuscitation, a blood transfusion and multiple procedures, and had to be transferred to two pediatric hospitals. According to Peeler, A.F. suffered two instances of abusive head trauma, and both the older brain bleed and the newer brain bleed were injuries that carry a substantial risk of death. Peeler estimated that A.F.'s newer brain bleed occurred forty-eight hours before she was seen at Trinity Frances Hospital on August 16, 2018, and the older brain bleed occurred sometime after her birth but before the newer brain bleed. A.F. had to be readmitted to the hospital two times due to complications from seizures, and A.F. has required occupational therapy, speech therapy, and physical therapy, and she requires medications to control her seizures. Peeler explained that A.F. suffered long-term effects from her injuries, and A.F. will "remain challenged for the rest of her life."

Officer Michael Goff testified that on August 16, 2018, he responded to an apartment in Rusk, where A.F. was lying on the floor and a man was performing CPR on her. According to Goff, Appellant stayed outside, and Appellant "just seemed angry more than anything." Nicholas Castle, a Texas Ranger with the Texas Department of Public Safety, testified that in August 2018, the Rusk Police Department asked him to assist with the investigation regarding A.F.'s injuries. Ranger Castle explained that he assisted the police with interviewing witnesses, and he eventually conducted a non-custodial interview of Appellant. Castle testified that Appellant responded promptly and appropriately during the interview, and a video recording of the interview was admitted into evidence. Castle opined that Appellant was being untruthful regarding A.F.'s injuries. Appellant ended the interview after informing Castle that he wanted an attorney.

Special Agent Hughes testified that he conducted a video-recorded custodial interview of Appellant in June 2019. Special Agent Hughes explained that he advised Appellant of his *Miranda* rights before the interview began, and Appellant agreed to speak with him. The video recording was admitted into evidence over defense counsel's objection that Appellant did not intelligently, voluntarily, or knowingly waive his *Miranda* rights. Hughes testified that he would have used deception to facilitate obtaining a confession from Appellant even if he had known that Appellant might suffer from IDD. Jonathan Fails, who lived in the same apartment complex as Appellant, testified that on one occasion, he saw Appellant shake A.F. Chief Stephen Hughes of the Rusk Police Department testified that he participated in Special Agent Hughes's interview of Appellant,

and he explained that during the interview, Appellant confessed to throwing A.F. onto the bed, hitting or kicking her bassinette, and shaking A.F. because she would not be quiet. Chief Hughes testified that Appellant did not appear to be mentally deficient, and he stated that Appellant could understand and answer the questions he was asked.

As discussed above, the trial court found Appellant guilty as to both counts and sentenced Appellant to fifty years of confinement on each count. The trial court ordered that Appellant's sentences would run concurrently. This appeal followed.

## DENIAL OF MOTION TO SUPPRESS AND ADMISSION OF CONFESSION INTO EVIDENCE

In issue one, Appellant complains of the denial of his motion to suppress his confession, and in issue two, Appellant challenges the admission of his confession into evidence as to both charged counts. Because issues one and two are related, we address them together.[3]

### Standard of Review and Applicable Law

We review a trial court's ruling on a motion to suppress under a bifurcated standard. *Hubert v. State*, 312 S.W.3d 554, 559 (Tex. Crim. App. 2010); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). We give almost total deference to the trial court's determination of historical facts and mixed questions of law and fact that rely on credibility determinations if they are supported by the record. *State v. Kerwick*, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). However, we review de novo questions of law and mixed questions of law and fact that do not rely on credibility determinations. *Kerwick*, 393 S.W.3d at 273. When, as here, a trial court does not make written findings explaining the factual basis for its decision, we imply findings of fact that support the trial court's ruling if the evidence supports those implied findings. *Meekins v. State*, 340 S.W.3d 454, 460 (Tex. Crim. App. 2011). At a hearing on the motion to suppress, the trial court is the exclusive trier of fact and judge of the credibility of the witnesses. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). A trial court may choose to believe or to disbelieve all or any part of a witness's testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). We must uphold the trial court's ruling

---

[3] Ordinarily, we would address issues three and four first because, if sustained, they would result in rendition of a judgment of acquittal. *See Price v. State*, 502 S.W.3d 278, 281 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *see also* TEX. R. APP. P. 47.1. However, because Appellant argues in issues three and four that we must not consider evidence of his confession because such evidence was improperly admitted, we will address issues one and two first.

6

on a motion to suppress if the ruling is supported by the record and is correct under any theory of law applicable to the case. *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003).

We review a trial court's decision regarding the admissibility of evidence under an abuse of discretion standard. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). We will uphold the trial court's ruling if it was within the zone of reasonable disagreement. *See Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018); *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g).

Article 38.21 of the Texas Code of Criminal Procedure provides that statements made by a person accused of a crime "may be used in evidence against him if it appears that the same w[ere] freely and voluntarily made without compulsion or persuasion[.]" TEX. CODE CRIM. PROC. ANN. art. 38.21 (West 2005). A person's mental deficiency alone is not determinative in ascertaining the voluntariness of a confession and the waiver of the Fifth Amendment privilege against self-incrimination. *Penry v. State*, 903 S.W.2d 715, 744 (Tex. Crim. App. 1995); *Smith v. State*, 779 S.W.2d 417, 429 n.8 (Tex. Crim. App. 1989); *see Casias v. State*, 452 S.W.2d 483, 488 (Tex. Crim. App. 1970) (holding that confession was admissible even though defendant had an IQ of 68, was illiterate, and had a mental age of eight to ten years); *Grayson v. State*, 438 S.W.2d 553, 555 (Tex. Crim. App. 1969) (concluding that statements from a defendant who had an IQ of 51 and a mental age of six years were admissible). Rather, in determining whether a confession was voluntarily made, courts must examine the totality of the circumstances. *Delao v. State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007) (citing *Arizona v. Fulminante*, 499 U.S. 279, 285-86, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)). Accordingly, "an accused's mentality is but one factor among many to consider when evaluating the voluntariness of a confession." *Id*. at 240 (citing *Bizzarri v. State*, 492 S.W.2d 944, 946 (Tex. Crim. App. 1973)). The totality-of-the-circumstances standard is sufficiently all-encompassing to protect a defendant's rights, taking into account such factors as intelligence, age, experience, and maturity. *Id*. at 241. Because mental capabilities are merely one factor to be evaluated among many, "this measure of voluntariness may be applicable to confessions made by anyone, no matter what [his] IQ happens to be." *Id*.

## Analysis

At the hearing on the motion to suppress, the trial judge heard Special Agent Hughes testify that Appellant responded appropriately to questions and was able to follow a timeline. The trial

judge also viewed the video recording of Hughes's questioning of Appellant. In addition, the trial judge heard Dr. Plasay testify that Appellant's mild IDD placed him in a category of individuals who have an elevated risk of internalizing the suggestions of the person interrogating them and giving false confessions. The trial judge also heard Plasay testify that she did not evaluate whether Appellant understood the *Miranda* warning, and that a diagnosis of IDD does not preclude someone from understanding the *Miranda* warning. Moreover, the trial judge heard evidence that two prior evaluations of Appellant did not result in a diagnosis of IDD.

Based upon our review of the record and considering the totality of the circumstances related to Appellant's confession, we conclude that the trial court did not err by concluding that Appellant was capable of voluntarily waiving his *Miranda* rights and did so. *See Kerwick*, 393 S.W.3d at 273; *Meekins*, 340 S.W.3d at 460; *Armendariz*, 123 S.W.3d at 404; *Ross*, 32 S.W.3d at 855; *see also* TEX. CODE CRIM. PROC. ANN. art. 38.21. We also conclude that the trial court correctly determined that Appellant's confession was made voluntarily despite any intellectual deficiencies. *See Delao*, 235 S.W.3d at 239-41; *Penry*, 903 S.W.3d at 744; *Smith*, 779 S.W.2d at 429 n.8; *see also Casias*, 452 S.W.2d at 488; *Grayson*, 438 S.W.3d at 555. Furthermore, we conclude that the trial court did not abuse its discretion by admitting the video recording of Appellant's confession into evidence and allowing testimony regarding Appellant's confession. *See Johnson*, 490 S.W.3d at 908; *Gonzalez*, 544 S.W.3d at 370; *Montgomery*, 810 S.W.2d at 391. For all these reasons, we overrule issues one and two.

### SUFFICIENCY OF THE EVIDENCE

In issue three, Appellant contends the evidence was insufficient to support his conviction on count one, and in issue four, Appellant contends the evidence was insufficient to support his conviction on count two.[4] Specifically, Appellant asserts that when his confession is removed from consideration, the evidence is insufficient. We address issues three and four together.

**Standard of Review and Applicable Law**

In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893,

---

[4] Appellant discusses both legal and factual sufficiency of the evidence in his brief. However, we only apply the *Jackson v. Virginia* standard. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010).

902 n.19 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "The trial judge, when sitting as the sole trier of facts, is the exclusive judge of the credibility of the witnesses and the weight to be given to their testimony." *Joseph v. State*, 897 S.W.2d 374, 376 (Tex. Crim. App. 1995). The factfinder is the ultimate authority on the credibility of witnesses and the weight to be given their testimony. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981). We defer to the trial court's responsibility to resolve any conflicts in the evidence, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

To meet its burden of proof, the State was required to prove that Appellant intentionally or knowingly caused serious bodily injury to A.F., as charged in the indictment. *See* Tex. Penal Code Ann. § 22.04(a) (West 2019). The Texas Penal Code defines "serious bodily injury" as a "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id*. § 1.07(a)(46) (West 2021). Because injury to a child is a "result-oriented" or "result of conduct" offense, the culpable mental state relates to the result of the charged conduct rather than the nature or circumstances surrounding the charged conduct, and the defendant must have engaged in the conduct with the required culpability to cause the result. *Haggins v. State*, 785 S.W.2d 827, 828 (Tex. Crim. App. 1990); *Patterson v. State*, 46 S.W.3d 294, 301 (Tex. App.—Fort Worth 2001, pet. ref'd). A person acts intentionally "when it is his conscious objective or desire to engage in the conduct or cause the result." Tex. Penal Code Ann. § 6.03(a) (West 2021). A person acts knowingly "when he is aware that his conduct is reasonably certain to cause the result." *Id*. § 6.03(b). Proof of a culpable mental state generally relies upon circumstantial evidence, and it ordinarily must be inferred from the accused's acts, words, conduct, and the surrounding circumstances. *Moore v. State*, 154 S.W.3d 703, 712 (Tex. App.—Fort Worth 2004, pet. ref'd).

**Analysis**

The trial court heard evidence that Appellant confessed to throwing A.F. onto the bed, shaking her, and spinning her bassinette because she would not be quiet and he lost his temper.[5] In addition, the trial court heard evidence that A.F. suffered from abusive head trauma on two occasions, as well as a rib fracture that occurred at least seven days before she was admitted to the hospital. The trial court further heard evidence that A.F. required two neurosurgical procedures, both of her head injuries created a substantial risk of death, and A.F. needed occupational therapy, speech therapy, and physical therapy. The trial court also heard evidence that A.F. required medication to control her seizures, and A.F. would face challenges for the rest of her life. Furthermore, the trial court heard Fails testify that he saw Appellant shake A.F. Viewing all the evidence in the light most favorable to the trial court's finding and deferring to the trial court's exclusive role in assessing the credibility of the witnesses and the weight to give their testimony, we conclude that the evidence is sufficient to support the trial court's finding that Appellant intentionally or knowingly caused serious bodily injury to A.F., as charged in counts one and two of the indictment. *See Brooks*, 323 S.W.3d at 902 n.19; *Penagraph*, 623 S.W.2d at 343; *Haggins*, 785 S.W.2d at 828; *Moore*, 154 S.W.3d at 712; *Patterson*, 46 S.W.3d at 301; *see also* TEX. PENAL CODE ANN. §§ 1.07(a)(46), 6.03(a), (b), 22.04(a). Accordingly, we overrule issues three and four.

## DISPOSITION

Having overruled each of Appellant's issues, we *affirm* the trial court's judgments.

GREG NEELEY
Justice

Opinion delivered November 3, 2021.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)

---

[5] As discussed in detail in our analysis of issues one and two, we conclude that the trial court did not err by denying Appellant's motion to suppress and admitting evidence regarding his confession.

10



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**NOVEMBER 3, 2021**

**NO. 12-20-00250-CR**

**JUSTIN LEE FOUNTAIN,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 2nd District Court
of Cherokee County, Texas (Tr.Ct.No. 21258)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgments.

It is therefore ORDERED, ADJUDGED and DECREED that the judgments of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*